# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

Dolores R. Lamar,
1095 Aspen Road
Stafford, VA 22554
313-303-3339

Plaintiff, Pro Se

v.

Hogan Lovells US LLP
555 13th St., NW
Washinton, DC 20004
202-637-5600

Defendant

Case: 1:25–cv–02097 JURY DEMAND
Assigned To : Kelly, Timothy J.
Assign. Date : 7/1/2025
Description: Employ. Discrim. (H–DECK)

Civil Action No._____  _____

Jury Trial Demanded

## COMPLAINT

COMES NOW Dolores R. Lamar (formerly known as Dolores R. Walden), by and for her

pro se Complaint against Defendant Hogan Lovells US LLP, alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises

under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e et seq. Jurisdiction is also proper under 28 U.S.C. § 1343, and 42

U.S.C. § 2000e-5(f)(3), which provides for jurisdiction and venue in Title VII actions.

2.      This Court also has supplemental jurisdiction over Plaintiff's claims under the D.C.

Human Rights Act of 1977, as amended, D.C. Code § 2-1401.01 et seq., pursuant to 28 U.S.C. §

RECEIVED

JUL 0 1 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

1

1367, because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution[1].

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as the unlawful employment practices alleged herein occurred in the District of Columbia and Defendant conducts business in the District of Columbia.

## PARTIES

4.      Plaintiff, Dolores R. Lamar, is an African-American woman and a resident of Stafford, Virginia.  At all times relevant to this Complaint, Plaintiff was employed by Hogan Lovells US LLP and known as Dolores R. Walden.  Plaintiff has since legally changed her name from Dolores Raye Walden to Dolores Raye Lamar (hereinafter "Ms. Lamar") following divorce.

5.      Defendant Hogan Lovells US LLP (hereinafter "Hogan") is a global law firm co-headquartered in Washington, D.C. and London, United Kingdom. Formed in 2010 through the merger of the American law firm Hogan & Hartson and the British law firm Lovells, Hogan employs approximately 2,800 lawyers across offices in the United States and internationally. Hogan is an employer within the meaning of Title VII and the D.C. Human Rights Act.  During the relevant period, Ms. Lamar worked in the Washington, D.C. office located at its physical location of 555 Thirteenth Street, NW, Washington, D.C. 20004, and worked with attorneys and staff located in various domestic offices of the firm.

---

1 Plaintiff brings claims under the D.C. Human Rights Act of 1977, as amended, D.C. Code § 2-1401.01 et seq., which were initially investigated by the D.C. Office of Human Rights (DCHR) during the administrative phase of this matter. The D.C. Office of Human Rights is not a party to this action. Plaintiff now seeks judicial redress under the substantive provisions of the DCHRA, over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as those claims arise from the same operative facts as Plaintiff's federal claims under Title VII.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      Ms. Lamar timely filed a charge of discrimination with the District of Columbia

Office of Human Rights (hereafter "DCHR") (Docket No. 20-092-P(CN)), which was cross-filed

with the Equal Employment Opportunity Commission (EEOC Charge No. 10C-2020-00094C).

7.      The EEOC issued Ms. Lamar a Right to Sue letter on April 3, 2025.  This Complaint

is being filed within 90 days of receipt of that letter. **ATTACHED AS EXHIBIT A**

## REQUEST FOR SUBSTANTIAL WEIGHT REVIEW FILED WITH EEOC

8.      On March 19, 2025, the DCHR issued a Determination of No Probable Cause. This

Determination failed to consider critical evidence submitted by Ms. Lamar, including documentation

that contradicted the employer's assertions. Further, after Ms. Lamar submitted a rebuttal to the

employer's Position Statement, the employer was permitted to alter and expand its claims, and Ms.

Lamar was not afforded an opportunity to respond to these new assertions.

9.      On April 3, 2025, Ms. Lamar filed a timely Request for Substantial Weight Review

(hereinafter "SWR") with the Equal Employment Opportunity Commission ("EEOC"), challenging

both the legal and factual errors in the Determination. The SWR was notarized, postmarked on April

3, 2025, and submitted within the 15-day filing window via United Parcel Service ("UPS") delivery.

The package was hand-delivered by a third-party mailer service which provided same-day

confirmation of receipt.

10.     Although the SWR was timely postmarked and mailed within the required 15-day

period, UPS initially misdelivered the package. Ms. Lamar subsequently provided the EEOC with

tracking confirmation, an affidavit from the third-party mail service verifying delivery to UPS, and

documentation from UPS acknowledging the misdelivery and confirming redelivery to the EEOC's Washington Field Office.

11.     Despite this, EEOC Federal Investigator, Yumi Cosbert ("EEOC Federal Investigator"), issued a Right to Sue letter dated April 3, 2025, without acknowledging or reviewing the timely submitted SWR. Ms. Lamar reminded the EEOC Federal Investigator that the Federal Mailbox Rule[2], pursuant to 26 U.S.C. § 7502, provides that a document postmarked on or before a statutory deadline is deemed timely filed. Despite this, the EEOC Federal Investigator refused to acknowledge receipt of the SWR and referred Ms. Lamar to the Right to Sue letter dated April 3, 2025.

12.     Ms. Lamar contends that this constituted a denial of procedural fairness and further demonstrates the institutional barriers she faced in seeking redress for unlawful discrimination and retaliation.

## **FACTUAL ALLEGATIONS**

13.     Ms. Lamar began her employment with Hogan Lovells in May 2015 as a temporary "Assistant," performing legal assistant duties for multiple attorneys. During this period, an "IP Specialist" position was posted internally, but she was advised that temporary employees were not eligible to apply. On July 27, 2015, Ms. Lamar was hired permanently in the same assistant role. Over time, she also took on additional responsibilities as a floor leader, coordinating overflow assignments among available assistants.

---

2 . See 26 U.S.C. § 7502(a)(1); Anderson v. United States, 966 F.2d 487, 491 (9th Cir. 1992) (holding that a timely postmark satisfies federal filing requirements under the mailbox rule).

14.     On February 5, 2018, Ms. Lamar reviewed Hogans' internal job postings and saw that a position for an IP Specialist in the Louisville, Kentucky office was available. Ms. Lamar reached out to the IP Manager, Robert Gruwell ("IPM Gruwell"), to express her interest in the position and to inquire whether it would be possible for her to apply while remaining based in the Washington, D.C. office. In response, IPM Gruwell stated via email, "DC's not off the table."

15.     At the time of these events, IPM Gruwell served as the IP Manager for both the Washington, D.C. and California IP Teams, two separate and distinct teams. The Washington, D.C. IP Team ("D.C. Team") supported attorneys located in Washinton, D.C., while the San Francisco, California IP Team ("California Team") was managed by Partner Jason Lohr ("Atty. Lohr") and supported Atty. Lohr's practice in Hogan's San Francisco office.

16.     Ms. Lamar applied for the position and received a call from Hogan's Employment Recruiter, Angela Sydnor ("Sydnor"), who conducted an initial interview to assess Ms. Lamar's qualifications for the IP Specialist role. Sydnor confirmed that Ms. Lamar met the necessary qualifications and subsequently scheduled interviews with IPM Gruwell, several Hogan attorneys, and Team Lead and IP Specialist Teri Nelmark ("Team Lead").

17.     While it took multiple attempts for Sydnor to schedule an interview with IPM Gruwell, Ms. Lamar was finally interviewed by IPM Gruwell on February 22, 2018, at which time. Ms. Lamar disclosed she had ten years of prior experience as an IP Specialist before joining Hogan in 2015, but had not worked in that capacity for the past three years. She asked about receiving updated training on changes in intellectual property laws, rules, and procedures, client-specific protocols, IP docket management software, and file handling requirements.

18.     Both IPM Gruwell and Team Lead assured Ms. Lamar that she would receive full training on all client-specific procedures as required by the client to whom she would be assigned, as

well as training on the relevant IP docket management software necessary to perform the duties of the position.

19.     At this time, Ms. Lamar worked an approved flexible schedule, alternating biweekly between a five-day week (9:00 a.m.-6:45 p.m.) and a four-day week (9:00 a.m.-6:00 p.m.) with every other Friday off. This arrangement, approved by IP Manager Gruwell and the Team Lead, began approximately a year before her April 9, 2018, appointment as an IP Specialist with the Amazon Team and did not interfere with Amazon's workload demands. The schedule also allowed Ms. Lamar to support her husband, who had suffered a cardiac event, and care for their daughter with special needs.

20.     At the time of her initial employment with Hogan, Ms. Lamar had more than 20 years of professional experience, including roles as a paralegal, legal assistant, and intellectual property assistant and IP Specialist (hereinafter "IPS"). Ms. Lamar had worked specifically in the capacity of an IP Legal Assistant and IP Specialist for 10 years prior to joining Hogan.

21.     To further complement her experience, Ms. Lamar earned a Bachelor of Business Administration (BBA) in Computer Information Systems in 2003 and a Master of Business Administration (MBA) in 2013. She also obtained an Intellectual Property Paralegal Certificate in 2012 and a Trademark Paralegal Certificate in 2018, both issued by IPLegalEd, an accredited organization whose programs are approved for Continuing Legal Education (CLE) credit by the National Federation of Paralegal Associations.

22.     Ms. Lamar, was hired as an IPS with a start date of April 9, 2018 and was assigned to the Amazon Team, supporting high-profile client Amazon, and was subject to a billable hourly requirement of 1,500 hours per year.

23.     Ms. Lamar was the only African American employee and IPS on the California IP Amazon Team and worked in a paperless capacity from the Washington, D.C. office, located in the same area as the D.C. Team. While Ms. Lamar worked directly across from the members of the D.C. Team, she did not work directly with any members of the D.C. IP Team.  Team Lead provided Ms. Lamar with the listing of Amazon team members[3] as follows:

**Amazon Team - attorneys**

Jason Lohr - Partner, San Francisco

Ira Jamshidi - Associate, Houston

Polly Sims - Associate, Houston

Sharon Du - Patent Agent, Houston

Sanjiv Reddy -Patent Agent, New York

Steven Blaine - Patent Agent, Louisville

Joe Grdinovac -Associate, Houston

Scott Richards - Patent Agent, DC

Joe Eng -Associate, New York

**Amazon Team - staff**

Teri Nelmark- Patent specialist and client manager, San Francisco

Stephanie McDonough - Patent specialist, Houston

Karyn Roades - Patent specialist, Louisville

Dolores Walden- Patent specialist, DC

John Varney-Docketing specialist, San Francisco

Sally Balmain - Billing, San Francisco

_____

3 Ms. Lamar retains a copy of the Listing of Amazon Team Attorneys and Staff and can produce this list during discovery.

24.     Approximately three weeks before Ms. Lamar was scheduled to begin her assignment

as an IPS on April 9, 2018, Team Lead, via email dated March 20, 2018,[4] scheduled a Webex

meeting titled "Training on Amazon Patent Procedures," set for March 20, 2018, from 1:00 p.m. to

5:00 p.m. Ms. Lamar was asked to attend the meeting and included on the email along with members

of the D.C. IP Team which included IPSs Tina Fluharty, Karyn Hines, and Leilani Legaspi.

Attorney Scott Richards was also invited to attend. The email was also copied to IP Specialist Karyn

Roades (hereinafter "IPS Roades") and IPM Gruwell. Each invitee was asked to print out the

"Amazon Outside Counsel Guidelines," dated October 27, 2015 which was attached to the email.

25.     The meeting was canceled after approximately 45-50 minutes as none of the invitees

including the D.C. IP Team attended. Ms. Lamar was the only participant in the conference room

with Team Lead who was present via Webex. Ms. Lamar printed a copy of the Supplemental

Outside Counsel Guidelines as requested but received no additional training materials. Team Lead

spent several minutes of the meeting attempting to locate the invitees and IPM Gruwell by phone,

and used the remaining time to provide Ms. Lamar with a brief overview of the team structure, her

expected workload, and the general nature of the work.

26.     During this meeting, Team Lead emphasized the urgent need for assistance,

explaining that IPS Roades was pregnant and would be going out on maternity leave at some point.

Ms. Lamar was instructed to review the Supplemental Outside Counsel Guidelines on her own time.

While the Amazon training could have proceeded as there were no AV issues preventing the

continuation of the meeting, Team Lead stated, "We will have to reschedule because I want

everyone to be in attendance." Ms. Lamar left the meeting, went to lunch, returned from lunch

---

4 Ms. Lamar retains a copy of referenced email dated March 20, 2018 and can produce copy during
discovery.

at/around 3:00 p.m. and resumed reviewing and responding to emails at her desk. The "Training on Amazon Patent Procedures" meeting was never rescheduled.

27.    While Ms. Lamar looked over the Outside Counsel Guidelines, Ms. Lamar observed that most of the content consisted of instructions for attorneys outlining specific procedures for drafting patent applications, communications with USPTO Examiners, items and amounts attorneys could bill for and items the client would not pay for.  However, these Guidelines did not provide instructions for IPSs or assistants who would be responsible for preparing and filing formality documents with the USPTO.

28.    The IPS role functions much like project management, where the IPS works independently overseeing large volumes of case files for various clients. Although, general USPTO filing procedures exist, most clients have unique, specific requirements for the different types of case filings that do not always conform to the standard processes and practices defined by the USPTO. Therefore, it was imperative that Ms. Lamar receive proper training on client-specific procedures to perform her duties accurately, efficiently, and effectively.

29.    Ms. Lamar began in her role as IPS on April 9, 2018 with Team Lead instructing Ms. Lamar that she would begin giving Ms. Lamar work after her return from attending a PCT training seminar in Dallas, TX.  As Team Lead was in the California office and Ms. Lamar was in the Washington, D.C. office, all communications were via email, calls and/or conferences which were electronically scheduled via Webex or Lync.  As such, all meetings and/or calls between Team Lead and Ms. Lamar were electronically documented on each parties' calendar.

**Denial Of Training and Access to Critical Resources**

30.     Despite the 1,500-hour billable requirement and the complexity of the work, Ms.
Lamar received no formal onboarding, no training on firm-specific IP docket management software,
or client-specific procedures upon assuming her role as an IP Specialist on April 9, 2018.

31.     Days into her new role, Ms. Lamar was instructed by Team Lead to prepare three
PCT applications. When Ms. Lamar reminded Team Lead that she had not received any onboarding,
software training, or guidance on the client's specific procedures for preparing PCT applications, she
was told that Team Lead was "too busy" to train her. Instead, Ms. Lamar was directed to contact IT
to have the required software installed and to familiarize herself with "PCT-Safe," a program
utilized by the California IP Team, software Ms. Lamar had not used in several years. Lacking
formal instruction, Ms. Lamar was forced to self-train using publicly available resources, including
YouTube videos and the WIPO website, to reacquaint herself with PCT-Safe, which was essential
for preparing and filing international patent applications.

32.     In lieu of a reliable docketing system, Ms. Lamar was provided an Excel spreadsheet
created by Team Lead. The spreadsheet was accessed by a link that was often inaccessible from the
Washington, D.C. office and was incomplete in that it only listed only U.S. patent applications while
omitting related foreign family patent applications, including PCT and patent filings in other
countries.

33.     Despite these limitations, Ms. Lamar completed assignments by re-familiarizing
herself with resources found the USPTO website, by reviewing prior filings and formality
documents and relying on public IP search tools. However, she frequently encountered issues due to
a lack of client-specific training, no access to full patent family case information, priority

information, case details, and incomplete correspondence and reference data, all of which are

normally accessible through professional IP docketing systems such as CPI, PATTSY, PATRICIA,

IPDAS, ANAQUA, FOUNDATION IP, PATENTUSA, IPFOLIO, and others Ms. Lamar was

familiar with.

34.    Ms. Lamar was instructed to prepare drafts of filings and forward to Team Lead for

review and check before Ms. Lamar could file the documents with the USPTO, which made it

impossible for her to work independently and slowed her down tremendously.

35.    Ms. Lamar states that Hogan was the only law firm in her entire IP career that failed

to provide access to an IP docket management software which is the backbone for all IP work, nor

provided client-specific training or resources that had been standard and mandatory at every other

firm where she worked as an IP Specialist.

36.    Further compounding the issue, Ms. Lamar was tasked with managing U.S.,

international and foreign filings, duties typically divided into two separate roles at most law firms,

including Hogan's D.C. IP Team, which employed a US IPS and a foreign filing IPS. Unlike other

similarly situated white IPSs on the Amazon Team who received onboarding for Amazon Training at

the very beginning of their employment as an IPS[5], Ms. Lamar received no training on Amazon's

complex, case-specific procedures.

37.    An example that demonstrates this deviating procedure was when Ms. Lamar was

preparing an IDS that required a fee payment.  It was the normal practice to pay the filing fee if the

filing fee was due. However, with some of Amazon's case files, the client did not want the fee paid.

---

5 Ms. Lamar retains a copy of referenced Carpe Diem time entry records showing time entered by
Amazon Team IPSs for training and travel to various Hogan offices across the U.S. to provide
training to IPSs on the Amazon Team and can produce a copy during discovery.

Ms. Lamar prepared the IDS for filing and prepared the fee payment document and forwarded draft for review to Team Lead who instructed "we are not paying the fee" but did not explain why the fee was not being paid. Team Lead did not respond to Ms. Lamar regarding this discrepancy and would not respond until the attorney copied on the email asked about the fee and why it was not being paid.

38.     A second example was when Team Lead asked IPS Roades to "work with Dolores in getting these national phases filed" regarding the filing of applications in Japan and China.  Ms. Lamar had informed Team Lead during her interview that while she had some foreign filing experience, this experience was minimal.  However, IPS Roades sent Ms. Lamar copies of the application translations for 2 national phase filings for use in filing applications in Japan and China and copies of other applications IPS Roades had filed herself, for Ms. Lamar to review to figure out how to file the applications as requested.  With no access to the IP docket management software which stored all relevant data for the applications, including priority application information needed to prepare the applications for filing with foreign patent agents, Ms. Lamar was left to "figure it out," utilizing all available online resources to refamiliarize herself with national phase filings and European regional phase filings.

39.     Ms. Lamar continued to receive assignments from the Team Lead through May 2018, many of which initially appeared routine. However, a troubling pattern developed. Ms. Lamar would prepare completed documents for filing and submit them for review, only to have them returned with numerous revisions reflecting "Amazon client-specific" requirements, details that were never provided to Ms. Lamar beforehand. As a result, Ms. Lamar was repeatedly forced to revise or completely recreate filings, often under significant time constraints. These inefficiencies prompted Ms. Lamar to again inquire about the training session originally scheduled for March 20, 2018. Team Lead responded that she was unable to stop and provide training due to a backlog of work and

the client's quarterly filing deadlines, instructing Ms. Lamar to "do the best you can" and promising to review her documents and identify what needed to be changed.

40.     This method of "learning after the fact" through trial and error, without access to critical client-specific instructions and IP docket management software and only having access to an ineffective Excel spreadsheet, amounted to a piecemeal, reactive approach that placed Ms. Lamar at a constant disadvantage. It caused unnecessary stress, undermined her confidence, and reflected a lack of good-faith effort by management to properly train and support her in meeting the expectations of the role. The failure to provide adequate training, despite repeated requests directly impaired her ability to perform her duties and fostered an environment in which mistakes could be attributed to her despite being rooted in management's neglect.

41.     Despite these challenges, Team Lead gave Ms. Lamar a glowing review in her email of May 11, 2018[6] email which includes the following statement from Team Lead:

*"Dolores, it has been a month since you started with our prosecution team and what a month it has been! Full of filings and not to mention computer problems. You handled it all beautifully!*

*Starting Monday, you will officially support Scott Richards (DC), Sanjiv Reddy (NY) and Polly Sims (Houston)."*

### Backlog Assignment and Unreasonable Workload

42.     In late May 2018, Ms. Lamar's workload significantly increased when the Team Lead assigned her a backlog of Information Disclosure Statement (IDS) filings that the Team Lead had failed to complete. Although IDS filings are required at the onset of prosecution and must be

---

6 Ms. Lamar retains a copy of Team Lead's May 11, 2018 email and can produce a copy of this email during discovery.

updated every three months, the backlog included numerous patent families, spanning both U.S. and foreign applications that had not been updated in over a year, with some files left unaddressed for more than two years. These files became urgent, as many were nearing final Office Actions, which would close prosecution and lead to patent issuance.

43.     Despite firm procedures requiring the responsible attorney to provide relevant references for IDS filings, including confidential disclosures, this protocol was not followed. Instead, Ms. Lamar was expected to independently review entire patent families to confirm proper citation of references across all related applications. This task was made even more difficult by the fact that Ms. Lamar operated in a paperless environment, lacked access to complete case files, and was denied access to a comprehensive IP docket management software that could and would have provided the necessary visibility into patent families and associated references.

44.     Ms. Lamar was forced to spend hours manually locating and cross-referencing information from scattered online files—despite being restricted to two-hour billable time limit for preparation of IDS filings. When Ms. Lamar submitted completed IDS drafts for review, Team Lead would often identify additional uncited references, including confidential disclosures, within minutes. This required Ms. Lamar to revise and resubmit the filings, creating a cycle of inefficiency and rework that severely impacted her productivity. Moreover, much of the additional time spent was non-billable.

45.     This situation illustrates the direct consequences of the firm's failure to provide essential training and access to necessary resources. Despite Ms. Lamar's repeated requests for support, she was denied adequate instruction and left to navigate highly complex, client-specific procedures through trial and error. The absence of proper training, coupled with unreasonable performance expectations and the imposition of excessive burdens without preparation, contributed

significantly to the creation of a hostile and untenable work environment, as Team Lead often became upset with Ms. Lamar when she asked for specific training and/or assistance with the backlog of IDS files and heavy workload which became evident when Team Lead "marked" up Ms. Lamar's email request in red and stating that she didn't have time to "do your work for you."

46.    On or around May 31, 2018, Ms. Lamar met with IP Manager Robert Gruwell ("IPM Gruwell") to report significant difficulties performing her assignment due to the lack of access to client specific instructions and proper IP docket management software. She explained that the Excel spreadsheet provided by Team Lead was often inaccessible, was frequently locked, and incomplete, particularly regarding related PCT and foreign patent files. She also explained that she could not effectively use IP Manager, the alternative software recommended by Team Lead, as it only contained U.S. files and did not connect to foreign or PCT cases.

47.    Ms. Lamar further reported that Team Lead was providing conflicting case-by-case instructions, making it difficult to keep up with her workload, which had grown to include a backlog of IDS (Information Disclosure Statement) filings—some of which had not been submitted in more than two years. She also raised concerns regarding Team Lead's reference earlier in the day to "xcodes" in billing, noting that Team Lead sent her a document without any explanation or instructions. Ms. Lamar was able to determine that Team Lead had provided inaccurate billing instructions, confusing task codes with global expense codes, which Ms. Lamar was able confirm with an email provided by Team Lead.

48.    On this same day, May 31, 2018, Ms. Lamar stayed late to complete a patent application filing. She emailed Team Lead a screenshot confirming the filing, including the new application number. The full document was not yet available on the USPTO's PAIR website, which

is common due to system delays, especially in the evening. Team Lead responded that she would handle reporting the filing to the client.

49.    Ms. Lamar did not report to work the following day, Friday, June 1, 2018, as it was her scheduled day off, previously approved by both Team Lead and IPM Gruwell as part of her flexible work arrangement.  This approval is evidenced in Team Lead's May 11, 2018, email stating: "*Since you are out of the office every other Friday, I will handle your docket on those days.*"

### Retaliation And Harassment

50.    Upon returning to work on Monday, June 4, 2018, Ms. Lamar was called into a meeting with IPM Gruwell and Team Lead, described as an "Amazon Best Practices" session. During the meeting, both IPM Gruwell and Team Lead accused Ms. Lamar of leaving on May 31, 2018 without completing the filing or reporting the submission to the client. Ms. Lamar stated that she had, in fact, sent confirmation and reminded Team Lead that she instructed that she would send the documents to client, and offered to provide a copy of the email from Team Lead confirming this. Ms. Lamar challenged the accuracy of Team Lead's statements wherein IPM Gruwell stated, "*I defer to Teri on everything; she is like an attorney.*" Ms. Lamar noted that Team Lead was not an attorney and held the same title as she did, IP Specialist.

51.    Ms. Lamar explained that she had stayed late to complete the filing but had to leave to catch her bus. IPM Gruwell responded, "*I don't care if you have to catch a bus... you need to make arrangements to stay late.*" When Ms. Lamar explained that she had a sick husband and a daughter with special needs and could not stay later, IPM Gruwell replied, "*I don't care about your personal issues... Amazon is the client, and everyone has to make sacrifices.*" He further stated that

her approved flexible schedule was now a *"problem*," and she would be required to work every Friday, despite prior agreement to her alternate Friday schedule.

52.     Following the June 4, 2018 meeting during which IPM Gruwell informed Ms. Lamar that she would be required to work overtime, she was forced to remain in the office for extended hours, often working more than 10 hours per day and, on some days, up to 13 hours. The demands were so excessive that Ms. Lamar was at times unable to retrieve her car from the parking garage and had to take a cab home as late as 11:00 p.m. These extreme hours created a physically and emotionally draining environment that caused significant stress and anxiety, strained her marriage, and contributed to an increasingly hostile and overwhelming work environment.

53.     Ms. Lamar reiterates that she was denied training and access to critical IP tools but was forced to work overtime to complete the voluminous workload without the tools or support afforded to similarly situated white IPS McDonough and IPS Roades. Both were allowed to work their standard 7.5-hour day and were not required to work overtime and/or assist Ms. Lamar. When Ms. Lamar asked IPM Gruwell whether IPS Roades or IPS McDonough could assist her, she was told that the workload had to be *"balanced"* and that no one was available to help.

54.     However, this was demonstrably false, as neither IPS McDonough nor IPS Roades were subjected to the same extreme overtime requirements imposed on Ms. Lamar.  For the month of June 2018, IPS McDonough reported working 7.5 hours per day, except for June 15 and June 18, where she entered 8.0 hours. IPS Roades reported working 7.5 hours per day, except for June 7 and June 8 (7.0 hours), June 18 (8.06 hours), and June 22 (7.18 hours). Neither IPS McDonough nor IPS

Roades was required to work overtime. This disparity is evident in the time records both IPS

McDonough and IPS Roades as entered Hogan's Carpe Diem timekeeping system[7].

55.    The hostility created was further compounded by the conduct of the Team Lead, who

created an even more toxic atmosphere by sending a relentless barrage of emails throughout each

workday, from the time Ms. Lamar arrived at the office until the time Ms. Lamar would leave,

making it nearly impossible for her to work in peace. The Team Lead also continued to provide Ms.

Lamar with conflicting and inconsistent details for patent filings. For example, Ms. Lamar was

instructed to use an Excel spreadsheet maintained by the Team Lead to prepare applications and

formalities, but when she did so, Team Lead would reject the filings as incorrect, claiming the titles

were wrong, even though the spreadsheet contained the client's "working title." Ms. Lamar was

never told in advance that client Amazon utilized different titles for its "working file" and a different

title for the application, details Ms. Lamar would not know or find out until after she prepared

documents, which resulted in Ms. Lamar being forced to redraft the documents, often voluminous

amounts of paperwork. Ms. Lamar was deliberately denied access to the firm's IP docket

management software, Anaqua, as evidenced in Team Lead's May 11, 2018 email and the contact

back and forth with Team Lead created an extreme amount of stress and anxiety for Ms. Lamar.

56.    Team Lead regularly used email correspondence to communicate with Ms. Lamar,

wherein she included Ms. Lamar's assigned attorneys, to unfairly criticize and undermine Ms.

Lamar's work product. This pattern of conduct appeared calculated to diminish the attorneys'

confidence in Ms. Lamar's abilities. Ms. Lamar is unsure whether the attorneys were aware that,

unlike similarly situated white IPSs on the Amazon Team, Lamar did not have access to the firm's

---

7 Ms. Lamar retains a copy of the Carpe Diem Time Record for June 18, 2018 for both IPS
McDonough and IPS Roades and can produce same at the time of discovery.

IP docket management software, which was essential to performing her duties accurately and efficiently. Despite her lack of access and training, Ms. Lamar was managing an extremely heavy workload, which often included six to seven filings in a single day, in addition to IP mailings, reporting tasks, and the backlog of IDS filings that Team Lead had assigned to her.

57.    Team Lead continued to add to Ms. Lamar's already large workload by instructing her to teach herself how to prepare "Patent Term Adjustments" (PTA)—a highly specialized process typically performed by attorneys or a dedicated department, as it involves extending a patent's term beyond the standard 20 years. At the time, not even IP Specialists in the D.C. office were not authorized to prepare PTAs. Team Lead's demand further demonstrated the unreasonable expectations placed on Ms. Lamar without adequate training or support.

58.    Ms. Lamar frequently copied IP Manager Robert Gruwell ("IPM Gruwell") on emails in which she requested his intervention to stop Team Lead's ongoing harassment and bullying. However, IPM Gruwell failed to respond. Ms. Lamar came to believe that he was complicit in this behavior, especially when during the June 4, 2018 meeting, both appeared to be "ganging up" on Ms. LaMar. This perception was reinforced on June 14, 2018, when IPM Gruwell returned to the office after several days' absence and, despite passing Ms. Lamar's cubicle, said nothing to her. She overheard him make a phone call from his office asking, *"How are things going*?" and *"Please send me what you have*," before closing his door without acknowledging her concerns.

59.    Later this same day, June 14, 2018 and around 3:30 p.m., IPM Gruwell asked Ms. Lamar to meet with him in his office. During this meeting, he stated, *"We have problems and we need to get some solutions*," and proceeded to relay accusations made by Team Lead, including accusing Ms. Lamar of failing to provide Attorney Sanjiva Reddy (hereinafter "Atty Reddy") with an updated version of Team Lead's Excel spreadsheet, failing to respond to Team Lead's email in a

timely manner regarding filings from the previous evening, and an unspecified "complaint" from Atty. Reddy, which IPM Gruwell declined to elaborate on.

60.     However, at 1:38 p.m. that same day, Atty. Reddy had emailed Ms. Lamar requesting an updated copy of both the Amazon and small-client Excel spreadsheets, along with links to the same. Ms. Lamar promptly responded by opening the spreadsheet, resizing, and creating a PDF copy of the spreadsheet which she sent to Atty. Reddy along with the hyperlinks to the live documents, stating, "*attached is what I have been provided*." As Ms. Lamar had "read-only" access to the Team Lead's spreadsheets which were stored and maintained by Team Lead in the California office, Ms. Lamar was unable to determine the last update or edit the documents and included Team Lead on the email in case any confirmation was necessary.

61.     Team Lead replied to Attorney Reddy stating, "*Sanjiv, please note the small client spreadsheet provided herein is not up-to-date, as that was sent to Dolores a few weeks ago. However, the links she provided are both currently up-to-date. Please let me know if you would like an up-to-date hard copy of the small client spreadsheet or if the link will suffice.*" This statement was false. Team Lead never sent Ms. Lamar printed copies as Ms. Lamar accessed the spreadsheet using the same link she had shared with Atty. Reddy. Team Lead's misrepresentation was a deliberate effort to imply that Ms. Lamar had provided outdated information when, in fact, the information accessed and shared was current.

62.     Atty. Reddy acknowledged receipt of the documents and links and expressed no concerns. Nonetheless, Team Lead's false statements and implication that Ms. Lamar was using outdated documents were clearly intended to sabotage her credibility and performance in the eyes of the attorneys she supported.

63.     Ms. Lamar holds a Bachelor of Business Administration in Computer Information Systems with a Microsoft Certified Systems Engineer (MCSE) specialization. Based on her training and experience, she affirms with certainty that "read-only" access to a shared document prevents a user from seeing real-time changes, even if others with edit access are actively updating the document.  In the May 11, 2018 email Team Lead:

*"It is important to remember that we are paperless. With that said, please remember to save all incoming emails from the client and all outgoing emails that you send or that your working attorney sends out. There is no need to save inter-office emails back and forth between our attorneys. Please let me know if you have any questions about this process. This is a very important step in maintaining our paperless world!"* and further stating in the same email as follows:

*"Please remember to keep the Amazon spreadsheet at your disposal. I maintain that spreadsheet in real time, therefore, it is always current. If you see a discrepancy at any time, please advise me."*

64.     The spreadsheet referenced was made available to Ms. Lamar via a shared link at the start of her assignment as an IPS. Ms. Lamar was instructed to rely on this Excel spreadsheet as her primary reference for preparing filings for Amazon and other smaller clients, effectively using it in place of a formal IP docketing database. However, on this occasion, Team Lead asserted that the spreadsheet Ms. Lamar had provided to Attorney Reddy was "a few weeks old" and "not up to date."

65.     This statement contradicted Team Lead's prior representation that the spreadsheet was maintained in real time and was always current. Ms. Lamar accessed the same shared link, generated a PDF of the spreadsheet, and forwarded it to Attorney Reddy along with a hyperlink to the live version, demonstrating that she provided the exact version that had been made available to her, a spreadsheet that was NOT up-to date. It was inconsistent for Team Lead, who also held the role of IPS, to claim the document was outdated while simultaneously instructing Ms. Lamar to rely on it as the definitive source of information for client filings.

21

66.    This inconsistency, along with the denial of access to Anaqua (the firm's IP docket management system) and lack of proper training, demonstrates that Team Lead and IP Manager Robert Gruwell never intended for Ms. Lamar to succeed in her role. While other similarly situated white IPS McDonough and IPS Roades did have access to Anaqua and full support, Ms. Lamar was left to rely on an inferior system, basically setting her up for failure.

67.    During this June 14, 2018 meeting with IPM Gruwell wherein Ms. Lamar was confronted with accusations of wrongdoing based on false claims made by Team Lead and despite explaining that she had responded to Team Lead's emails and copied Team Lead on client correspondence, and used the only version of the spreadsheet available to her via read-only access, IPM Gruwell attempted to coerce Ms. Lamar into admitting fault stating that there was more she could have done but failed to do and continued to accuse Ms. Lamar of failing to send Atty. Reddy the information he had requested.   IPM Gruwell appeared to dismiss what Ms. Lamar was saying and refused to let her leave his office until she agreed that she had done something wrong.  He also continued to accuse Ms. Lamar of not responding to Team Lead's emails although Ms. Lamar offered to provide proof of responding to Team Lead's emails.  Ms. Lamar asked IPM Gruwell why it appeared that he was being complicit in allowing Team Lead to bully and harass Ms. Lamar and asked why he took a "hands off" approach as it appears that she was being targeted and discriminated against and that IPM Gruwell was being unfair and refusing to listen to anything Ms. Lamar had to say. Ms. Lamar also reminded IPM Gruwell that to date, she had not received any training and was expected to be able to complete the workload without adequate resources.

68.    Ms. Lamar asked about the possibility of getting a program like CPI, an IP docket management programs she had worked with in other law firms.  It was during this meeting that IPM Gruwell told Ms. Lamar that the firm was working on securing alternative IP docket management

22

software as the licenses they were looking into were too expensive and instructed that Ms. Lamar would need to stop complaining and to work with the resources provided to get the work done. IPM Gruwell continued to tell Ms. Lamar that these issues with the spreadsheet needed to be resolved. The meeting had become contentious. Ms. Lamar, under extreme emotional distress, began crying and repeatedly told IPM Gruwell that she could not verify whether the spreadsheet had been updated, as she had only read-only access and no editing privileges which he continuously denied. Staff began walking past IPM Gruwell's glass-walled office to observe the escalating situation and IPM stated that "*we will have to revisit this again later*."

69.    Ms. Lamar asked IPM previously in an email who the managing partner for the group was to which he never replied. However, during this meeting Ms. Lamar asked IPM Gruwell directly who managed the IP department as she believed that he was complicit in allowing Team Lead to intentionally bully and harass her. IPM Gruwell after several minutes finally told Ms. Lamar she should reach out to Director of Practice Support, Darrell Coopper (hereinafter "DPS Cooper).

70.    This meeting had gone on for almost 2.5 hours and Ms. Lamar was finally allowed to leave IPM Gruwell's office after failing to pressure Ms. Lamar into admitting to wrongdoing. Ms. Lamar exited the office in tears and went home. As a result of the emotional distress and anxiety caused by the incident, she was unable to report to work the following day, Friday, June 15, 2018, and called out sick.

71.    Ms. Lamar prepared an email to IPM Gruwell with the intention to copy DPS Cooper. However, in her frustration and haste she entered his email in the subject line and sent the email[8] to

---

8 Ms. Lamar retains a copy of the referenced email dated June 15, 2018 and can produce a copy during discovery.

IPM Gruwell but re-sent the email directly to DPS Cooper requesting a meeting to discuss the events that had been occurring, including the forced to work overtime and having to stay in the office close to midnight, being called into IPM Gruwell's office and being falsely accused based on Team Lead's complaints and mistruths regarding Ms. Lamar, issues with the spreadsheet, issues with the IDS filings, the heavy workload and the backlog of IDS case files that Team Lead assigned and stated "it feels like I am being unfairly targeted to the point of harassment," and how all of the issues had been going on for more than 3 weeks. IPM Gruwell did not deny any of the statements made in this email, did not deny that Ms. Lamar was being forced to work overtime and stated something to the fact that he agreed that a meeting should take place.

72.     When Ms. Lamar returned to work the following week and resumed her duties, IPM Gruwell approached her desk and, in a loud and public manner, stated, *"Is everything okay? We don't want you going off the rails,"* within earshot of the entire D.C. IP Team and several nearby attorneys. He repeated this conduct on multiple occasions, despite its inappropriate and disruptive nature, until Ms. Lamar was compelled to contact DPS Cooper and request that he request IPM Gruwell to cease making these remarks.

73.     This behavior caused Ms. Lamar significant emotional distress and anxiety and appeared to be a form of harassment, particularly given the context of the previous week's contentious meeting. During that meeting, Mr. Gruwell had attempted to pressure Ms. Lamar into admitting to alleged wrongdoing, an accusation she denied and found to be unfounded. Many of the individuals who overheard Mr. Gruwell's later public comments had seen or were aware of that prior meeting, leading Ms. Lamar to believe that IPM Gruwell's actions were not only retaliatory but deliberately designed to cast her in a negative light. She reasonably believed that Mr. Gruwell was attempting to isolate her, create distrust between her and her colleagues on the D.C. IP Team, and

undermine her professional relationships with attorneys in the Washington, D.C. office. The was further evidenced when Ms. Lamar was removed from her assignment as IPS for Team Amazon on July 12, 2018 by DPS Cooper and instructed to ask the D.C. IP Team for any overflow work Ms. Lamar could prepare for them.  When Ms. Lamar asked members of the D.C. IP Team for any overflow assignments she could work on, Ms. Lamar was told that IPM Gruwell instructed them NOT to give Ms. Lamar any work. DPS Cooper would secure work for Ms. Lamar in other departments so that she could meet her daily billable requirement.

74.     Ms. Lamar met with DPS Cooper on or around June 19, 2018 to discuss the information in the email sent on June 15, 2018.  Ms. Lamar reiterated the information contained in the email and told DPS Cooper that she believed she was being bullied, targeted, and discriminated against as she was the only black employee on the California IP Team and Amazon Team and there was no other reason for the adverse treatment.  DPS immediately dismissed Ms. Lamar's concerns and stated, "*I have known Rob for a long time and he is not racist.*"  When Plaintiff reiterated the issues she experienced as evidence for her belief, DPS Cooper emphatically stated "*I know for a fact that he is not racist....*"  Ms. Lamar told DPS Cooper that she did not believe that IPM Gruwell would show obvious racism to DPS Cooper, who was also African American, and IPM Gruwell's supervisor.   However, DPS Cooper again dismissed Ms. Lamar's concerns regarding racial discrimination and harassment and stated that he would get to the bottom of the situation.

75.     DPS Cooper stated that he was aware of the challenges in the IP Group with not having a dedicated IP docketing management software but that management was already working on this issue, and mentioned that IP management was researching different providers because the one they were currently looking into charged too much for their "use" license.

76.     After Ms. Lamar's meeting with DPS Cooper, the forced overtime stopped and Ms. Lamar was able to go back to her flexible schedule. Ms. Lamar had previously agreed to come in on Friday, June 29, 2018 to complete an application which had to be filed before July 2, 2018, but would resume her flexible schedule after this time.

77.     Beginning the week of June 20, 2018, Team Lead and IPM Gruwell scheduled what were described as "training sessions." However, during the first Lync meeting, it became immediately apparent that the session was not for training purposes. Instead, Team Lead spent the meeting berating Ms. Lamar for allegedly filing work without billing for it and presented a list of such items. Ms. Lamar was able to demonstrate that she had, in fact, billed for the items in question and was within the standard three-day billing window for recent entries. In response, Team Lead began yelling over the conference call about IDSs being billed under a general code rather than a client-specific code. IPM Gruwell remained silent and allowed the conduct to continue. While Team Lead was yelling, Ms. Lamar reviewed her Carpe Diem time entries to refute the accusations in real time. Team Lead then shifted focus to saved emails, insisting that Ms. Lamar return to the start of her assignment to verify that all emails had been saved. Ms. Lamar explained that she had been saving all incoming client emails and outgoing correspondence, including emails sent on behalf of attorneys, and was only a few days behind due to recent time off. Team Lead responded by shouting, "*No, no, no, you must save them every* day." Ms. Lamar assured her she would bring everything current.

78.     Team Lead was also upset when Ms. Lamar asked one of the D.C. IPS what method she used to upload PDFs to the USPTO, as Team Lead had given Ms. Lamar conflicting instructions. Team Lead began yelling "*you are not supposed to be asking them anything, you are supposed to*

26

*ask me.*" I informed Team Lead that I would make sure to catch up the emails the same day and the meeting was concluded.

79.     Two days later, on Friday, June 22, 2018, IPM Gruwell scheduled another Lync meeting labeled as a "training" session with Team Lead. During the meeting, Team Lead expressed dissatisfaction with how Ms. Lamar managed her docket. She objected to Ms. Lamar's use of the term "defer" instead of "rollover" and insisted that Ms. Lamar mirror the way she responded to her own docket, despite Ms. Lamar never having been trained on the "clearing" process or provided any guidance on Team Lead's method. Team Lead also criticized Ms. Lamar for crossing out or shading docket items that did not pertain to her workload. When Ms. Lamar explained that she kept a printed copy of her docket (a daily docket of no more than a 5 pages) beside her monitor to help her stay organized and focused, Team Lead began yelling, stating, *"Why are you printing out the dockets when we are supposed to be paperless?*" She further stated that Ms. Lamar should not be using the copier. IPM Gruwell, who was also on the call, agreed that Ms. Lamar should not use the printer. Ms. Lamar was confused by this reaction, as the docket was a personal tool used to manage her daily assignments and not an official document.

80.     Ms. Lamar had already reached out to the Docketing Specialist John Varney (hereinafter "DS Varney"), the docketing specialist who received the "marked" dockets at the end of the day, early in my assignment to get a clear understanding on how he wanted Ms. Lamar to report her docket and spoke with him frequently.  DS Varney did not have any issues with Ms. Lamar's reporting and told Ms. Lamar that she was doing a great job and that "Hogan is lucky to have you."

81.     Following the June 22, 2018 meeting, Ms. Lamar sent an email to both Team Lead and IPM Gruwell summarizing what had been discussed and blind copied DPS Cooper to keep him informed of the conversations.  In the email, Ms. Lamar noted that the video calls, which were

represented as training sessions, did not include any substantive training. She also stated that she

needed to use the printer to print her docket, as doing so helped her work more efficiently. DPS

Cooper promptly responded to all parties, inquiring about the issue and confirming that Ms. Lamar

had permission to use the printers at any time. IPM Gruwell replied that he had not stated Ms. Lamar

could not use the printers but had merely suggested an alternative way to work.

82.    Ms. Lamar believed that the video calls presented as training sessions but lacking

actual instruction were instead being used to continue the prior pattern of harassment and to create

additional frustration and disruption to Ms. Lamar.

### Falsified Time Records

83.    On or around June 27, 2018, Ms. Lamar checked her Carpe Diem Time record to

make sure she entered time for the two meetings held with IPM Gruwell and Team Lead the week

before. In Ms. Lamar's previous role as "assistant" Ms. Lamar was responsible for entering time for

various timekeepers that she was assigned. Ms. Lamar looked at Team Lead's Carpe Diem records[9]

to see how Team Lead recorded the time to make sure she was recording her time correctly in her

own record. Ms. Lamar noticed that Team Lead had billed 15 hours of "training with Dolores" in

the last few weeks. Ms. Lamar was confused at this entry because there had been no training

provided in the few weeks passed. Ms. Lamar continued to view Team Lead's Carpe Diem time

entries and discovered that Team Lead, up to the point Ms. Lamar discovered the falsified time

entries, had entered and billed more than 70 hours of "training with Dolores" throughout the duration

of Ms. Lamar's employment as IPS on the Amazon Team. However, this information was false and

could be proven by the lack of scheduled training sessions that would have been visible on both

---

9 Ms. Lamar retains copies of Team Lead's Carpe Diem time records of various dates which show
falsified time entries and can provide a copy of same during discovery.

Team Lead's calendar and Ms. Lamar's calendar and the many emails wherein Team Lead

instructed that she had *"no time to train."*

84.    Ms. Lamar reached out to IPM Gruwell and informed him that she had reviewed

Team Lead's time entries to make sure she billed for the two meetings in the prior week correctly

and noticed that Team Lead was falsely entering time for "training with Dolores" that had not

occurred.  IPM Gruwell replied that "there had been lots of training" and immediately contacted the

IT department to have them update Ms. Lamar's permissions to remove access to other timekeeper's

records.  Ms. Lamar was not aware that she was not supposed to have access to timekeeper records

in her role as IPS.

85.    After Ms. Lamar discovered and reported the falsified time entries entered by Team

Lead to IPM Gruwell, Ms. Lamar observed an immediate shift in Team Lead's tone, with emails

becoming increasingly critical and hostile. This escalation in tone and scrutiny culminated in a

disciplinary meeting held on July 5, 2018, with DPS Cooper and IPM Gruwell, which Ms. Lamar

believes was retaliatory in nature.

86.    During the week of June 25, 2018, Ms. Lamar diligently worked to complete her

caseload in preparation for an application scheduled to be filed on Monday, July 2, 2018. To ensure

timely completion, she reported to the office on Friday, June 29, 2018, which was her regularly

scheduled day off, to begin preparing the application. When the task "file application" appeared on

the docket for that Friday, Ms. Lamar was unable to clear the item, as the filing had not yet occurred.

Team Lead had been sending emails throughout the week, demanding that Ms. Lamar respond to

docket entries, which she did. To reflect the status of the pending filing, Ms. Lamar entered

"rollover" for the application task to indicate that it was still in progress and would be cleared once

completed. Ms. Lamar had already been instructed by Team Lead to not use words like "in the
process" or "working on application" and used "rollover" as Team Lead had instructed.

87.    IP work involves multiple layers of docketing to safeguard against missed deadlines.
These typically include a monthly docket, weekly docket, three-day docket, daily docket, and a
"drop-dead" docket for critical deadlines. When Ms. Lamar entered "rollover" on her daily docket, it
did not remove the item but served to acknowledge and defer it when immediate clearance was not
possible. In this case, the application was scheduled for filing on Monday, July 2, 2018, at which
point Ms. Lamar intended to clear the corresponding docket entries.

88.    Despite this, Team Lead falsely accused Ms. Lamar of making an error that would
have resulted in the loss of patent rights if Team Lead had not caught the "mistake" in time. Team
Lead was fully aware that the June 26 and June 29, 2018, entries were merely reminders and that
"rollover" did not clear the item from the docket. Team Lead also knew that Ms. Lamar was actively
in the office on her scheduled day off, preparing the documents for filing on July 2, 2018.

89.    Although Team Lead was fully aware of the facts, she sent a reprimanding email with
attorneys copied, attempting to create the false impression that Ms. Lamar had made a serious error,
which was not the case. The following week, on July 5, 2018, DPS Cooper called Ms. Lamar into a
conference room with himself and IPM Gruwell and presented her with a memo written by IPM
Gruwell. The memo accused Ms. Lamar of multiple performance failures, including not meeting
Amazon's standards, and falsely claimed she had received several hours of training but performing
poorly. This memo also threatened termination if Ms. Lamar could not find a way to get along with
Team Lead. Ms. Lamar was not allowed to respond during the meeting. When she asked DPS
Cooper if he had read her June 15, 2018, email outlining the discrimination and harassment she had
been experiencing from IPM Gruwell and Team Lead, he replied, *"I don't have time to read all of*

*that.*" He also refused to allow her to explain that no error had occurred regarding the docket item she had rolled over. During the July 5, 2018, disciplinary meeting, DPS Cooper angrily told her to *"be quiet."* It was clear that he had not investigated the validity of the false allegations made by IPM Gruwell and Team Lead.

90.     Ms. Lamar believed that her termination was imminent, given that DPS Cooper issued a memo threatening termination based on false allegations and admitted he had not read her email outlining the unfair targeting and harassment she had experienced. The allegations prompting the disciplinary action were entirely untrue and, therefore, could not be corrected. At the time of these events, neither IPM Gruwell nor DPS Cooper had experience in intellectual property, and thus were not able to assess whether Team Lead's claims were valid. When Ms. Lamar attempted to defend herself, DPS Cooper loudly told her to "be quiet" and refused to allow her to respond. As a result of his failure to investigate her complaints, the harassment and targeting by Team Lead continued.

91.     Ms. Lamar reached out to her former supervisor, Angela Tyson (hereinafter "AAM Tyson"), who was the Attorney Assistant Manager to see if she could return to her former position as she feared she would be fired based on the memo issued by DPS Cooper.  While there were no current positions open, AAM Tyson informed that Ms. Lamar would be able to apply for any available positions that opened in the future.  Ms. Lamar would apply for an available opening in late 2018 and return to her former position as "Assistant" in December 2018.  The return to this position was effectively a demotion, however, Ms. Lamar believed she had no other alternatives and could not afford to lose her job.

## Constructive Discharge

92.     On July 12, 2018, while working in the office, Ms. Lamar was discharged from her role as IP Specialist by DPS Cooper after responding to an email from Team Lead and inadvertently copying the client's docketing department at Amazon. Ms. Lamar immediately sent another email to the client docketing department asking them to please disregard this email as it was sent in error which Ms. Lamar believed to be proper.  This email did NOT go to any of the client Amazon's attorneys.  However, because of this error, Ms. Lamar was removed by DPS Cooper from her assignment as IPS.

93.     Leading up this event was Team Lead sending a barrage of emails throughout the day criticizing Ms. Lamar for reporting information regarding the fees when Ms. Lamar reported receipt of the Notice to File Missing Parts (NTFMP) received from the USPTO.  Ms. Lamar correctly reported that the Office Action was received and informed of the applicable fee associated with the NTFMP in accordance with prior reporting of similar notices, and informed client that we would respond to the NTFMP and pay the applicable fees.  This was a normal, acceptable reporting. However, Team began sending emails to Ms. Lamar criticizing Ms. Lamar in the email for mentioning the fees.  Team Lead was sending Ms. Lamar emails almost after each reporting Ms. Lamar sent to client, with conflicting instructions and criticisms although Ms. Lamar had reported the document correctly.

94.     This constant interruption while Ms. Lamar was actively working caused her significant anxiety. She believed that failing to respond would result in another meeting with IPM Gruwell, which she was trying to avoid. To bring the exchange to a close, Ms. Lamar responded to one of Team Lead's messages, clarifying that she had followed instructions, and requesting clarity

on the contradictory directive not to include fee information. In doing so, she inadvertently copied the client's docketing department.

95.    Ms. Lamar believes Team Lead's excessive emails were by design and intended to frustrate her during the workday, and in the middle of Ms. Lamar trying to complete her assignments and reduce her workload.  Ms. Lamar's single response, made in good faith to clarify instructions, did not warrant removal from her assignment as IP Specialist.

96.    As DPS Cooper had removed Ms. Lamar from her assignment with Team Amazon and stated he would try to find other work for her to do, he instructed Ms. Lamar to reach out to members of the D.C. IP Team to see if there was any work she could assist them with.  However, the D.C. IP Team had been instructed by IPM Gruwell to NOT give Ms. Lamar any work and Ms. Lamar was unable to obtain any overflow work from the D.C. IP Team.

97.    DPS Cooper informed that he would reach out to his litigation group for any possible overflow work and would begin sending Ms. Lamar assignments so that she would be able to meet her billable requirement after she returned from vacation which began the following week.

98.    Effectively, on July 12, 2018, Plaintiff was constructively discharged from her position as IP Specialist by DPS Cooper. Although her employment with the firm did not formally end at that time, she was removed from her role and left without a clear reassignment for several months. This removal, combined with the lack of reassignment and the retaliatory context in which it occurred, constituted a constructive discharge from her IP Specialist position.

99.    Further Ms. Lamar filed a formal Complaint with Allison Friend, Chief Human Resources Officer of the Americas, who forwarded the Complaint to Monique Jefferson, Head of HR, Business Services of the Americas and Global (hereinafter "HHR Jefferson"), regarding the

events which took place.  HHR Jefferson agreed to assist Ms. Lamar with finding a different position with Hogan, however, ultimately Ms. Lamar returned to her former position as "assistant" at the end of December 2018 when a position became open.

100.    In November 2018, HHR Jefferson and DPS Cooper met with Ms. Lamar to talk to her about the events which had taken place and told her that there was nothing they could do because Atty Lohr, the Managing Partner over client Amazon and Team Lead brought client Amazon to Hogan and they had no say so over the actions of Team Lead.  HHR Jefferson and DPS Cooper suggested that Ms. Lamar "apologize" to Team Lead and Atty. Lohr and they might allow Ms. Lamar to return to her position as IPS.

### Evidence Of Discriminatory Denial of Training

101.    The Carpe Diem time entry records reviewed by Ms. Lamar upon her reassignment to the Assistant role revealed a consistent and deliberate pattern: Team Lead had a clear and established pattern of training for similarly situated white IPSs on the Amazon team and routinely traveled to various Hogan Lovells offices to provide in-person training on Amazon procedures to newly assigned white IPSs who were assigned to Team Amazon. This included training provided to IPS Monica Williams in Houston in November 2018; IPS Roades and IPS Mick Bowman in Louisville in May 2017; and IPS McDonough and Attorney Sharon Du in Houston during the same period. Each of these individuals received documented, dedicated training visits from Team Lead following their onboarding.  While IPS Roades had gone out on maternity leave in late August 2018 and the Amazon Team was now "short staffed" at the end of the year, Team Lead, despite having been too busy to train Ms. Lamar throughout the duration of Ms. Lamar's assignment as IPS, traveled to Houston, TX after IPS Williams' initial re-onboarding on Hogan systems to train IPS on Amazon procedures.

102.     In contrast, Ms. Lamar, despite serving as an Amazon-designated IP Specialist, was **never afforded such training**, nor was she ever met in person by Team Lead during her tenure in the role. This disparate treatment is particularly striking given that Ms. Lamar repeatedly requested client-specific Amazon training and was criticized for not performing according to Amazon standards—standards she was never trained on.

103.     This pattern of selective in-person training for similarly situated white IPSs on the Amazon Team, while denying such critical instruction to Ms. Lamar, constitutes strong evidence of discriminatory treatment and supports her claims of unequal access to training and constructive demotion.

### Final Attempt at Sabotage and Improper Restriction of Access to Client Files

104.     In a final attempt to undermine and discredit Ms. Lamar following her removal from the Amazon Team on July 12, 2018, Team Lead orchestrated a situation that appeared to question Ms. Lamar's competency. In early August 2018, after Ms. Lamar had gone several weeks without substantive assignments or billable work despite a 1500-hour annual requirement, she was abruptly asked to assist Team Lead and the Amazon Team with a simple task, drafting a client report letter related to an Issue Fee document received from the USPTO.

105.     When Ms. Lamar attempted to retrieve the necessary documents from Team Lead's casefiles, a separate database Hogan allowed Team Lead to create within Hogan's larger Imanage document and email database and where Amazon Team files were stored, Ms. Lamar found herself unable to access them. The files displayed lock symbols, indicating restricted access. Ms. Lamar contacted the firm's IT department, but the IT specialist was unable to access the files and unable to determine the cause of the access issue. When Ms. Lamar asked Team Lead about the problem,

Team Lead dismissed it, suggesting Ms. Lamar was searching in the wrong location and requested a screenshot of her search.

106.    Ms. Lamar then reached out to DPS Cooper for assistance, requesting that the files be either sent to her or unlocked. Despite Ms. Lamar's familiarity with the IManage system, which Ms. Lamar had used daily since beginning her role as IPS in April 2018 and had consistently utilized throughout her employment with Defendant and at previous law firms, DPS Cooper insisted that Team Lead conduct a screen-sharing session to "teach" Ms. Lamar how to access the database. This unnecessary step created the appearance that Ms. Lamar lacked the basic skills to navigate the system.

107.    A meeting was arranged by IPM Gruwell, in which both IPM Gruwell and DPS Cooper were present while Team Lead conducted a so-called training session. During the meeting, Ms. Lamar repeated the same search steps and again encountered locked files. Nelmark performed a different search using alternate criteria and located files housed in the firm's public domain. Ms. Lamar recalled that during her initial assignment as an IPS in April 2018, the public domain contained no Amazon documents, and she had been informed at the time that due to the confidential nature of the Amazon files, they were stored in a restricted location that only Team Lead controlled. It later became apparent that in mid-July 2018, while Ms. Lamar was on vacation, Team Lead had contacted the IT department and requested that Ms. Lamar's access permissions be revoked for all Amazon client files and other files under Atty Lohr. IT complied, and Team Lead began transferring her restricted files to the public domain. This significant change was never disclosed to Ms. Lamar, nor to her assigned attorney, Atty. Reddy, or DPS Cooper. As a result, the true cause of the access issues was misrepresented, and Ms. Lamar was made to appear incompetent in front of management.

108.    Following the IManage meeting, Ms. Lamar was eventually granted access and completed the assignment. However, the confusion, delays, and public questioning of her

competence could have been avoided entirely had Team Lead disclosed her request to restrict Ms. Lamar's access. The misrepresentation allowed management to believe the issue stemmed from user error rather than deliberate access restriction.

109.    Ms. Lamar's suspicion that she was being deliberately sabotaged was further confirmed weeks later when she encountered Hogan's Remote Access Specialist (hereinafter "RAS") who was also an acquaintance to Ms. Lamar while commuting to work. RAS expressed surprise to see Ms. Lamar and stated that she believed Ms. Lamar had been terminated. When asked why RAS believed this, RAS explained that the IT department had received instructions from Team Lead in July 2018 to revoke Ms. Lamar's access to client files, including those for the Amazon team.

110.    Further RAS informed Ms. Lamar that Team Lead had been instructed to move her files to Hogan's general document and email Imanage database because Hogan would soon be installing a new email and document database software and removing Imanage, and if Team Lead did not move her files, the files would be lost and unable to be recovered.

111.    Team Lead, in her attempt at sabotaging Ms. Lamar in the eyes of DPS Cooper and attorneys copied on the email, never informed DPS Cooper or any of the copied attorneys that Team Lead had been instructed to move her files to Hogan's main database and this was the reason Ms. Lamar could not access them in early August 2018, when she was abruptly brought back to the Amazon Team after having been removed from the Amazon Team assignment on July 12, 2018.

112.    This calculated manipulation of file access and the subsequent setup of a staged training session was intended to discredit Ms. Lamar in front of firm management. At no time did Team Lead correct the narrative or inform the others present that she herself had initiated the access revocation. As a result, Ms. Lamar's professionalism and competence were unfairly called into question in a retaliatory and deceptive manner.

113.    Ms. Lamar brought this information to DPS Cooper's attention. However, DPS was no longer interested in hearing anything regarding this matter.

## FACTUAL INCONSISTENCIES AND MISSTATEMENTS OF MATERIAL FACT

114.    Plaintiff repeats and incorporates by reference all allegations set forth in paragraphs 1 through 113 above, as though fully stated herein.

115.    The DCHRs' Letter of Determination ("LOD") contains numerous factual inconsistencies and misstatements of material fact that, taken together, undermine the credibility and accuracy of its "No Probable Cause" finding. A comparison of Defendant's Answer and the LOD reveals the following key issues:

### Training Time Discrepancy Falsified Time Entries

116.    The DCHR asserted that Plaintiff claimed Team Lead "falsified" over 70 hours of time entries for one-on-one training sessions in 2018, but failed to provide evidence demonstrating that these entries were in fact false. However, the DCHR accepted without scrutiny similar time entries as definitive proof that training occurred for other similarly situated white IPSs on the Amazon Team, despite Plaintiff having submitted a higher standard of proof in her own case.

117.    Specifically, Plaintiff provided contemporaneous documentation, including side-by-side comparisons of her Outlook calendar with the Team Lead's calendar, which demonstrated that no such training sessions were scheduled or took place. In many instances, Plaintiff was demonstrably engaged in unrelated assignments or was not scheduled to be at work during the specific time blocks that the Team Lead billed as "training." Moreover, there is no evidence that any Webex or Lync conferences were electronically scheduled during those periods, platforms that would have been necessary for any remote or virtual training to occur. These omissions further discredit the legitimacy of the purported training.

118.    In contrast, the time entries and travel logs associated with training provided to similarly situated white IPSs on the Amazon Team were corroborated by consistent Carpe Diem time entry records demonstrating a pattern of scheduled, in-person instruction. DCHR's selective treatment of evidence, discounting Plaintiff's falsification claims while uncritically accepting unverified time entries for similarly situated white IPSs on the Amazon Team reflects a misstatement of material fact and a failure to conduct an impartial credibility assessment.

119.    Furthermore, DCHR failed to investigate the discrepancy between the billed training time and the objective record. It accepted Defendant's explanation without further inquiry, disregarding the possibility of overbilling or fraud. This omission is significant considering Defendant's own Global Fraud Policy, which applies to all firm personnel, including partners, attorneys, business services, secretarial staff, and temporary employees. The policy explicitly defines fraud to include, among other things, intentional overbilling, inflated or duplicate billing, and falsely claiming overtime, sick leave, or special leave.

120.    DCHR's failure to investigate these material inconsistencies undermines the credibility and integrity of its findings and supports Plaintiff's contention that the Team Lead's falsified time records were used as pretext to fabricate the appearance of adequate training, when, in fact, no such training occurred.

### Training Based on Experience

121.    In the DCHRs' Letter of Determination (LOD), Defendant claimed that, due to Plaintiff's prior experience, she was expected to "hit the ground running" upon assuming the IP Specialist role, and repeatedly asserted that Plaintiff's ten-plus years of prior IP experience negated the need for additional training. However, this assertion is contradicted by both the circumstances surrounding Plaintiff's onboarding and contemporaneous documentation. Plaintiff had been absent

from the intellectual property field for over three years, during which time there were significant

changes in USPTO procedures and IP docketing systems. Further, Plaintiff had never worked for

client Amazon and was unaware of client's specific procedures for preparation of IP related work.

122.    Despite this, Plaintiff was not provided with updated client-specific training, was

denied access to critical prosecution tools, including the Anaqua IP management system, —and was

not given sufficient time or support to reintegrate into the role. Internal emails show that the Team

Lead explicitly stated she had "no time to train," yet continued assigning Plaintiff a full and

expanding workload, including sensitive assignments for high-profile client Amazon. These

conditions made it impossible for Plaintiff to reasonably "hit the ground running" in a highly

specialized and continuously evolving legal field.

123.    Notably, just one day before Plaintiff formally began her assignment as an IP

Specialist on April 9, 2018, both the Team Lead and IPS Roades traveled together to Dallas, Texas,

to attend PCT training. Plaintiff was not informed of or offered the opportunity to attend this

training, despite being assigned PCT filing responsibilities within days of assuming the role. This

training would have been directly relevant and beneficial, particularly given the complexity of PCT

procedures and Plaintiff's three-year absence from the IP field. The failure to include Plaintiff in this

instruction further evidences the lack of support and reintegration provided.

124.    Moreover, both IPM Gruwell and the Team Lead were fully aware of Plaintiff's

extended absence from the IP field and the corresponding need for reintegration support, yet failed to

provide the necessary tools or training to facilitate her success. Plaintiff submitted these internal

email communications to the DCHR as contemporaneous evidence, yet the agency failed to consider

or reference them in its LOD.

125.    The DCHR nevertheless adopted Defendant's assertions, even while acknowledging that Plaintiff had been out of the IP field for three years and that the Amazon Team's client-specific procedures required specialized instruction. In doing so, DCHR failed to account for the evolving nature of IP law and client protocols, and disregarded contemporaneous evidence demonstrating that similarly situated white IPSs on the Amazon Team received structured, in-person training regardless of their prior experience.

126.    Further, in the DCHRs' LOD Defendant stated that by June 2018, Plaintiff was struggling in her role as an IP Specialist, failing to meet expectations, and lacking sufficient attention to detail. This claim was based on false allegations made by Team Lead, including the assertion that Plaintiff nearly caused the loss of patent rights for an application she was actively preparing to file. Neither IPM Gruwell nor DPS Cooper, both of whom lacked experience in intellectual property, were able to assess the accuracy of Team Lead's technical claims. In fact, these accusations were misleading and appeared designed to induce adverse action against Plaintiff.

127.    This narrative is directly contradicted by contemporaneous documentation. Plaintiff produced an email from Team Lead during this same period in which she gave Plaintiff a glowing review and praised her work product, despite Plaintiff working without access to essential tools or client-specific training. In the same email, Team Lead acknowledged that Plaintiff had not been granted access to Anaqua, Defendant's IP docket management system utilized by other similar situated white IPSs on the Amazon Team.  Although Anaqua had only been partially implemented in Defendants' IP Department in 2018 for those of whom the Defendant paid the "use" licensing fee, it was a critical resource for managing patent portfolios, and its full adoption firmwide was already underway, as confirmed in internal communications distributed to Plaintiff in 2023.

128.     The denial of Anaqua access significantly hindered Plaintiff's ability to perform core IP functions and supports the inference that Defendant failed to provide the necessary tools for success. Both IPM Gruwell and DPS Cooper admitted to Plaintiff that the Anaqua license was "too expensive," acknowledging that Plaintiff was expected to perform sophisticated docketing work without the benefit of standard industry software. Despite these limitations, Plaintiff was assigned a disproportionately heavy workload. Team Lead, who had left a backlog of IDS filings, some overdue by more than two years, assigned that backlog to Plaintiff, in addition to her existing assignments.

129.     Plaintiff was also directed to perform tasks beyond the typical scope of the IP Specialist role, including preparing Patent Term Adjustment (PTA) calculations, which are normally handled by attorneys. Simultaneously, IPM Gruwell required Plaintiff to work extensive overtime, including days lasting up to 13 hours. Defendant's claim that Plaintiff was underperforming is incompatible with the fact that she was entrusted with time-sensitive filings, complex tasks, and a growing volume of responsibility.

130.     This treatment also highlights disparate expectations, as similarly situated white IPSs Roades and McDonough, also on the Amazon team, both of whom had more direct experience on client Amazon work product, were not subject to comparable levels of overtime or unsupported responsibilities. Plaintiff submitted contemporaneous email communications and internal records documenting these conditions to the DCHR, yet the agency failed to meaningfully consider this material evidence in its determination.

131.     Defendant further claimed that Plaintiff received more training and support than her peers, including participation in a four-hour training session scheduled for March 20, 2018. However, Plaintiff submitted contemporaneous evidence, including internal emails and task records, proving she was at her standalone workstation performing assistant and floor leader duties during the time of the alleged training. Plaintiff also demonstrated that the session was abruptly canceled when

invited participants did not show up for the meeting and the meeting was never rescheduled. The Amazon Training never occurred.

132.    In its LOD, the DCHR adopted Defendant's revised explanation that the training was canceled due to technical issues with Webex and further delayed due to staffing shortages, including IPS Roades' maternity leave.   Plaintiff was the only invitee who showed up for the "training session" and was able to converse with Team Lead without audio visual issues.

133.    Plaintiff provided additional contemporaneous evidence in her Request for Reconsideration, showing that on April 8, 2018, Team Lead and IPS Roades traveled together to Dallas, Texas, for PCT training, undermining the claim of unavailability. Plaintiff also submitted Carpe Diem time records showing that IPS Roades continued billing time through the end of August 2018, after which her maternity leave began. These records directly contradicted Defendant's claims and constituted material, contemporaneous evidence that DCHR failed to consider in its findings.

### Protected Activity Timeline

134.    Defendant claimed that Plaintiff did not raise any concerns of discrimination until July 13, 2018. This assertion is demonstrably false. On June 15, 2018, Plaintiff sent an email to IPM Gruwell, with DPS Cooper copied, outlining specific incidents of discrimination, harassment, forced overtime, and targeting she experienced while working on the California IP Team for client Amazon. DPS Cooper later admitted during the July 5, 2018 disciplinary meeting that he had not read the June 15, 2018 email, stating he "*didn't have time.*" Despite this, he issued a memorandum threatening Plaintiff with termination approximately one week later.

135.    IPM Gruwell, who also received the June 15 email, responded the same day, writing: "*I agree we should discuss all of this as I said yesterday, with Darrell present. He's good at*

43

*bringing clarity and solutions to the table. Darrell's out of the office but I believe he's back on Tuesday.*" At no point did IPM Gruwell deny or dispute the allegations Plaintiff raised. IPM Gruwell did not address Plaintiff's descriptions of the hostile work environment, the overtime directive IPM Gruwell issued, or her claims of being unfairly targeted. Given the seriousness of these allegations, it is reasonable to expect a senior manager to promptly refute or clarify any false or exaggerated claims. His failure to do so serves as tacit acknowledgment of the accuracy of Plaintiff's assertions. Plaintiff also met with DPS Cooper on June 19, 2018, believing he had read the June 15, 2018 email. During that meeting, she reiterated the substance of the email and explicitly stated that she believed she was being subjected to discrimination. Neither IPM Gruwell nor DPS Cooper took any steps to investigate or address these concerns.

136.    Plaintiff submitted the June 15, 2018 email and related correspondence as contemporaneous documentary evidence to the DCHR. Despite the clear relevance and probative value of these communications, the DCHR failed to acknowledge or consider this evidence in its LOD. This omission reflects a failure to evaluate material facts directly contradicting Defendant's position and undermining the credibility of its stated rationale.

137.    Further, the DCHRs' LOD misstates the legal standard for protected activity under the D.C. Human Rights Act. It concluded that Plaintiff's June 15, 2018 email raising concerns of harassment, unfair targeting, and lack of training, was not protected activity because it did not explicitly mention race. This interpretation contradicts well-established law, which provides that an employee need not use specific "magic words" such as "discrimination" or "race" for a complaint to qualify as protected activity, so long as the content clearly opposes potentially discriminatory conduct (Crawford v. Metro. Gov't of Nashville, 555 U.S. 271 (2009)).

## Overtime and Disparate Treatment

138.    The DCHRs' LOD relied on materially false and misleading information provided by

Defendant. Specifically, Defendant stated that Plaintiff worked with IPS Karyn Hines (hereinafter

"IPS Hines"), a member of the Washington, D.C. IP Team. This assertion is demonstrably false. IPS

Hines was not a member of the Amazon Team, nor did she work with Plaintiff on Amazon client

matters. Plaintiff believes Defendant deliberately misled the DCHR by providing a blatantly untrue

statement to misrepresent the team composition and minimize the racial disparities in work

assignments and treatment.

139.    The LOD further states: "*IPS1 (Black) worked in the same office as Complainant, and

they occasionally worked on projects together. IPS1 had no issues receiving adequate training and

was not required to work overtime, however she was not assigned to the same demanding, large

Respondent client as Complainant.*" Based on the description, IPS1 appears to refer to IPS Hines.

However, IPS Hines was not assigned to the Amazon Team and did not share the same client

workload as Plaintiff. The LOD's reliance on her experience and race as IPS Hines is African

American, is therefore misplaced and irrelevant.

140.    Moreover, the DCHRs' LOD acknowledged that IPS1 (Black), referencing IPS Karyn

Hines, was not required to work overtime, while Plaintiff frequently worked late into the evening,

including as late as 10:30 p.m. However, this comparison is irrelevant, as IPS Hines was not

assigned to the Amazon Team and did not perform work for the same high-demand client. Rather

than investigating whether this overtime disparity reflected a racially disparate impact among

similarly situated white IPSs assigned to the Amazon Team, the DCHR dismissed the discrepancy

by attributing it solely to client differences, without critically examining whether Plaintiff was

disproportionately burdened or whether similarly situated white IPSs on the Amazon Team were

held to the same standards and expectations. In fact, the only four IPSs assigned to the Amazon Team during the relevant period were:

- IPS Teri Nelmark – Patent Specialist and Client Manager (San Francisco)
- IPS Stephanie McDonough – Patent Specialist (Houston)
- IPS Karyn Roades – Patent Specialist (Louisville)
- Plaintiff Dolores Walden – Patent Specialist (Washington, D.C.)

141.    Of these, Plaintiff was the only Black IPS on the Amazon Team. Defendant's claim that "all IPSs were subject to overtime as needed" is directly contradicted by the time records of IPS McDonough and IPS Roades, as recorded in Defendant's Carpe Diem timekeeping system. For example:

- IPS McDonough reported working 7.5 hours per day throughout June 2018, except on June 15 and June 18, where she entered 8.0 hours.
- IPS Roades reported working 7.5 hours per day, with slight deviations on June 7 and June 8 (7.0 hours), June 18 (8.06 hours), and June 22 (7.18 hours).

142.    Neither was subjected to extended hours or compelled to work past standard business hours as Plaintiff was. The disparity is further compounded by the fact that Plaintiff submitted contemporaneous time entries and emails documenting her prolonged overtime schedule, which was not equally imposed on white IPSs on the Amazon Team.

143.    Additionally, Defendant falsely stated that IPS Roades was on maternity leave during the relevant period as an explanation for why training was not available to Plaintiff. This claim is contradicted by the Carpe Diem records, which show that IPS Roades actively recorded work hours throughout June 2018. There is no indication in the record that she was on leave at the time.

144.    Plaintiff continued to work with the Amazon Team until July 12, 2018, when she was removed from the assignment by DPS Cooper. Afterward, DPS Cooper instructed Plaintiff to request

work from members of the Washington, D.C. IP Team to meet her billable hour requirement. However, Plaintiff was later informed that IPM Gruwell had directed team members on the D.C. IP Team not to assign her any work. As a result, DPS Cooper solicited overflow assignments from within his litigation group to find work for Plaintiff.

145.    The DCHR's failure to investigate these discrepancies regarding both overtime burden and team assignments, reflects a misstatement of material fact and a failure to critically assess the Defendant's shifting and unsupported explanations. These misrepresentations obscure the clear disparity in treatment between Plaintiff and similarly situated white IPSs on the Amazon Team and further support Plaintiff's claim that she was subjected to discriminatory and retaliatory treatment while employed on the Amazon Team.

## Carpe Diem Time Entries

146.    In the DCHRs' LOD, Defendant denied that Team Lead traveled to Defendant's Houston office to provide training to attorneys working with on the Amazon Team as well as providing Amazon training and materials to IPS McDonough.  IPS McDonough worked for Defendant as an IPS before Team Lead and Atty Lohr were hired and came to Defendant bringing client Amazon to the firm.  IPS McDonough who worked as an IP Assistant and then as IPS would also begin assisting Team Lead with Amazon client work and became a member of the Amazon Team as listed on page 7.  However, Plaintiff submitted Team Lead's Carpe Diem time entries labeled "travel from Louisville to Houston for further training purposes." DCHR accepted Defendant's denial without evaluating this concrete documentary evidence, and instead dismissed the discrepancy as a matter of perspective. Plaintiff submitted detailed, annotated Carpe Diem time entries showing that the Team Lead consistently traveled to multiple offices to provide one-on-one training to other similarly situated white IPSs on the Amazon Team, training Plaintiff did not

receive. Further, Plaintiff has never met Team Lead in person during the entire duration of her assignment as IPS.

147. These objective, time-stamped records contradicted Defendant's claim that such training was either unavailable or unnecessary, yet DCHR failed to reference or analyze this critical evidence in its determination.

### Misapplication Of The "Same Actor Inference

148. In the DCHRs' LOD, Defendant invoked the "same actor" inference, asserting that IPM Gruwell enthusiastically supported Plaintiff's hiring and therefore would not have been the same individual to terminate her employment. This argument is both factually and legally flawed. First, Plaintiff provided contemporaneous documentation and emails demonstrating that IPM Gruwell was not solely responsible for Plaintiff's selection for the IP Specialist position. HR Recruiter Angela Sydnor conducted Plaintiff's initial screening, coordinated interviews with multiple attorneys and Team Lead, and made repeated attempts to schedule an interview with IPM Gruwell, who was frequently unavailable and appeared disinterested in participating in the hiring process.

149. Second, Plaintiff was not terminated or removed by IPM Gruwell. Rather, Plaintiff was removed from her position as IPS by DPS Cooper following a pattern of harassment and targeted disciplinary action, despite Plaintiff's prior complaints of discrimination. Plaintiff submitted email evidence to the DCHR in which DPS Cooper explicitly stated that Plaintiff was being removed from her position. This directly contradicts the premise that IPM Gruwell both hired and fired Plaintiff.

150. Despite these clear factual distinctions, the OHR improperly relied on the "same actor" inference and disregarded the contemporaneous communications that disproved its

applicability. The failure to evaluate this critical evidence constitutes a material error in the OHR's findings.

### Misrepresentation of IPM Gruwell's Management Role

151.    In the DCHRs' LOD Defendant's assertion that Team Lead, who held a role similar to that of Plaintiff, was primarily responsible for providing training and managing team assignments, while IPM Gruwell served only as the overall supervisor and *"rarely became involved in day-to-day operations."* However, this characterization is directly contradicted by Plaintiff's experience and contemporaneous email communications.

152.    However, IPM Gruwell was actively involved in the day-to-day oversight of Plaintiff's work and repeatedly called her into his office based on unverified allegations and complaints relayed by Team Lead. Rather than providing training or support, Team Lead functioned as an intermediary who reported to IPM Gruwell, triggering managerial intervention based on incomplete or false narratives. On multiple occasions, IPM Gruwell confronted Plaintiff with accusatory statements that originated from Team Lead, often without giving Plaintiff an opportunity to respond. These interactions were documented in emails and other internal communications submitted to the DCHR.

153.    Despite the submission of this contemporaneous evidence showing regular involvement by IPM Gruwell in operational matters, particularly in his oversight of Plaintiff, the OHR failed to consider this documentation and instead accepted Defendant's unsupported narrative. This omission reflects a mischaracterization of managerial roles and responsibilities, and further undermines the credibility of the findings in the LOD.

## Denial Of Access to Anaqua IP Docket Management System

154.    Defendant submitted to DCHR a copy of Team Lead's May 11, 2018 email, wherein Team Lead stated that Plaintiff did not "*yet have access to Ford's database (Anaqua)*." This statement was misleading. While Anaqua's development may have involved early input from corporate IP executives at Ford Motor Company and British American Tobacco in 2004, by 2018 Anaqua was a commercially available, web-based IP docket management platform used by numerous law firms and corporations to manage all phases of intellectual property, including patents and trademarks. It was not proprietary to Ford and could be independently licensed by law firms, including Defendant.

155.    Based on Plaintiff's understanding and representations made by IPM Gruwell, Defendant was using Anaqua as one of its primary IP docket management systems, though it was also considering alternative platforms. IPM Gruwell further admitted to Plaintiff that the firm's software license was cost-prohibitive, which explained why she was not granted access, not due to client-imposed restrictions. Plaintiff was instead required to rely on a shared Excel spreadsheet to manage her docket, and to route all work through the Team Lead for review before filing, conditions not imposed on similarly situated white IPSs on the Amazon Team, who had full access to Anaqua and were permitted to work independently.

156.    The firm's decision to deny Plaintiff access to Anaqua, a critical prosecution tool, impaired her ability to perform essential IP Specialist functions, independently manage deadlines, and bill efficiently for her work. These conditions directly contradicted Defendant's claim that Plaintiff was expected to "hit the ground running," and instead support Plaintiff's contention that she was set up to fail. The DCHR failed to address this contemporaneous evidence or investigate the inconsistent rationale provided by Defendant.

157.    Plaintiff further raised this issue with DPS Cooper during a meeting on or around June 19, 2018. DPS Cooper also acknowledged that the license for the IP docket management system was too expensive, and that the firm was exploring other alternatives. The firm's financial decision to withhold software access from Plaintiff, while affording access to similarly situated white IPSs on the Amazon Team constitutes additional evidence of disparate treatment. Plaintiff observed that both the Team Lead and IPS Roades were able to generate Information Disclosure Statement (IDS) documents within 20–30 minutes for some of the most voluminous patent family files, further evidencing their full access to IP management tools that Plaintiff lacked.

158.    This pattern of selective access was later contradicted by Defendant's own internal communication. In a global firmwide email dated April 6, 2023, entitled *"Reminder – Launch of Anaqua for Patent Prosecution Docketing"*, Hogan announced that it was fully transitioning its IP docketing operations to Anaqua, consolidating both patent and trademark matters under the Anaqua platform. The email acknowledged that while the firm previously used both Anaqua and IP Manager, it was consolidating onto Anaqua because it was "a proven platform we already use globally" and superior to the legacy system. This announcement confirms that Anaqua was not proprietary to any one client and had been in firm-wide use long before the 2023 rollout.

159.    Taken together, these facts undermine Defendant's explanation and highlight the firm's internal choice to deny Plaintiff essential resources needed to succeed, while providing those resources to similarly situated white IPS on the Amazon Team. The DCHR's failure to evaluate this contemporaneous, material evidence reflects a broader pattern of disregarding facts that contradicted Defendant's narrative.

## COUNT ONE

**Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the D.C. Human Rights Act of 1977, as amended, D.C. Code § 2-1401.01 et seq.**

160.     Plaintiff hereby repeats and realleges paragraphs 1 through 159 as if fully set forth herein.

161.     Plaintiff is an African American woman and, as such, is a member of a protected class under Title VII and the D.C. Human Rights Act.

162.     Defendant engaged in unlawful race-based discrimination against Plaintiff in violation of Title VII of the Civil Rights Act of 1964 and the D.C. Human Rights Act, including but not limited to: denying Plaintiff access to essential training that was provided to similarly situated white IP Specialists; restricting Plaintiff's access to critical tools and systems necessary to perform her job, including the Anaqua IP management system; imposing disparate workload expectations— such as requiring Plaintiff to work forced overtime that was not imposed on similarly situated white IP Specialists assigned to the Amazon Team, despite Plaintiff being assigned to the same client and performing comparable duties;  denying Plaintiff equal access to support, advancement opportunities, and fair treatment in the workplace; and making false or misleading statements to government agencies regarding Plaintiff's training and managerial support in an attempt to conceal and justify its discriminatory conduct.

163.     Defendant's conduct created and perpetuated a hostile and unequal work environment based on race, resulting in Plaintiff being treated less favorably than similarly situated white IP Specialists assigned to the Amazon Team, despite Plaintiff being assigned to the same client and performing comparable duties.

164.     Defendant's actions, policies, and omissions constitute unlawful race discrimination in violation of Title VII and the D.C. Human Rights Act.

165.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered and continues to suffer economic harm, emotional distress, reputational damage, and other compensable injuries.

166.    As a further consequence of Defendant's discriminatory demotion of Plaintiff from the role of IP Specialist to a legal assistant, Plaintiff has experienced substantial difficulty securing comparable employment within the intellectual property (IP) field. Positions in IP, particularly at the specialist level, are limited in availability and require a highly specialized skill set. Most law firms distinguish between U.S. and international IP prosecution roles, and Plaintiff had been proficiently performing both. The demotion, coupled with the stigma of a reduced title and responsibilities, has significantly undermined Plaintiff's professional standing and marketability. This reputational harm has made it more difficult for Plaintiff to compete for roles aligned with her experience and qualifications. Furthermore, Plaintiff is at a continuing economic disadvantage, as IP Specialist positions typically offer significantly higher earning potential, with salaries ranging from $60,000 to over $150,000, as this field is not capped, whereas the assistant position to which Plaintiff was demoted is capped at approximately $99,000. The career disruption, financial loss, and inability to restore her standing in the IP field have caused Plaintiff ongoing emotional distress, including anxiety, embarrassment, and a diminished sense of professional worth. Defendant's actions have not only derailed Plaintiff's career trajectory, but also inflicted continuing psychological and reputational harm.

## COUNT TWO

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the D.C. Human Rights Act of 1977, as amended, D.C. Code § 2-1402.61**

167.    Plaintiff hereby repeats and realleges paragraphs 1 through 166 as if fully set forth herein.

168.    Plaintiff engaged in protected activity under Title VII and the D.C. Human Rights Act by, among other things, complaining to management and Human Resources about race-based discrimination, lack of training, exclusion from support systems, forced overtime, and the denial of equal treatment in the workplace.

169.    Shortly after engaging in these protected activities, Plaintiff was subjected to a series of retaliatory actions, including but not limited to removal from client work, reassignment to an assistant position, continued denial of access to necessary systems and tools, exclusion from team communications, and denial of promotional opportunities.

170.    After Plaintiff was removed from the Amazon Team on July 12, 2018, and subsequently brought back in early August 2018 with no substantive work assigned and no billable hours to record, she was asked to prepare a client-facing draft email involving an Issue Fee document. When attempting to retrieve the necessary supporting files from Team Lead's Amazon Team case files, Plaintiff discovered that she had been locked out of the Amazon client files. The file icons displayed lock symbols, indicating restricted access. Plaintiff contacted IT to report the issue, and a member of Defendant's IT group was also was unable to open files and was not sure what the issue was, but this delay obstructed her Plaintiff's ability to perform the assigned task. Plaintiff does not believe this restriction was not applied to similarly situated white IPS on the Amazon Team and appeared to be a deliberate attempt by Team Lead to undermine Plaintiff's performance and reputation following her removal from the team. This action constituted a continuing retaliatory effort to sabotage Plaintiff in the eyes of firm management, assigned attorneys and clients, and was directly related to Plaintiff's earlier protected activity, including complaints of harassment, discrimination, and forced overtime.

171.    Defendant's retaliatory actions would dissuade a reasonable employee from engaging in protected activity, and in Plaintiff's case, they resulted in significant reputational harm, emotional distress, and further economic disadvantage.

172.    Defendant's conduct constitutes unlawful retaliation in violation of Title VII and the D.C. Human Rights Act.

## COUNT THREE

**Continuing Retaliation – Denial of Promotion to Practice Support Specialist**
**(In Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a),**
**and the D.C. Human Rights Act of 1977, as amended, D.C. Code § 2-1402.61)**

173.    Plaintiff hereby repeats and realleges paragraphs 1 through 172 as if fully set forth herein.

174.    In or around July 2024, Plaintiff learned that Defendant was hiring new assistants into the role of Practice Specialist through external platforms such as LinkedIn, rather than through the firm's internal job posting system. The starting salary for these new roles was initially listed between $115,000 and $125,000 and was later reduced to a range between $105,000 and $115,000. After receiving an email from Assistant Attorney Manager Dana Lewis ("AAM Lewis") inviting staff to meet one such new hire, Plaintiff inquired about the opportunity. The newly hired Practice Support Specialist replaced a former "Assistant" and was assigned to work with some of the same attorneys previously supported by Plaintiff.

175.    AAM Lewis informed Plaintiff that she did not meet the eligibility criteria for promotion because the new position involved "marketing" duties, even though Plaintiff had regularly worked with the marketing department and performed marketing-related work during her tenure.  Plaintiff was also told that promotion to the Practice Specialist position required supporting

department heads. However, the newly hired employee did not meet this criterion. At the time, Plaintiff was already supporting attorneys who were heads of practice groups and among the firm's top earners. This information was available on the firm's intranet and known or easily accessible to management, and Plaintiff specifically relayed these facts to AAM Lewis who claimed she was unaware.

176.    Shortly after expressing interest in the role to one of her timekeepers, Plaintiff was informed by AAM Lewis and in early December 2024, just 30 minutes before the firm's annual holiday party in December 2024, that she was being promoted to Executive Assistant, a position she had not applied for or expressed interest in. Plaintiff was further informed that this promotion would not come with any increase in compensation due to her having reached the salary cap for that role.

177.    During the same period, the firm offered buyout packages to several assistants and replaced them with Assistants who would be promoted to Practice Specialists. These Assistants were reportedly instructed not to disclose their promotions until after the New Year 2025.

178.    Later in December 2024, Plaintiff observed three Practice Support Specialist roles posted internally and submitted applications for all three. On or about December 23, 2024, Plaintiff interviewed with AAM Lewis, who gave positive feedback and stated that follow-up interviews would take place after the holidays and after the New Year 2025.

179.    However, when Plaintiff returned from the holiday break, and on January 3, 2025, she discovered via the firm's intranet that all three positions had already been filled. Some of the individuals promoted into those roles had not submitted formal applications and were previously employed by the firm as assistants. One such individual, who had less tenure, experience, and education than Plaintiff, approached her in the cafeteria, asking if she had been promoted to which

56

Plaintiff responded "I applied for the position." This employee expressed surprise that Plaintiff had even needed to apply, stating, "Why would you have to apply? I didn't have to apply."

180.    Plaintiff observed that other newly hired or promoted employees, many with less experience and education were now serving as Practice Specialists and receiving higher salaries than Plaintiff. These disparities were verifiable through Defendant's internal systems and public professional platforms such as LinkedIn. Feeling targeted and disheartened, Plaintiff withdrew her pending applications. The firm subsequently hired additional external candidates with lesser qualifications into the same role.

181.    These events followed Plaintiff's protected activity, including complaints of disparate treatment in the Intellectual Property Department. DPS Cooper, who was directly involved in removing Plaintiff from her role as IP Specialist, was fully aware of these events. Given his close working relationship with AAM Lewis, it is reasonable to conclude that she, too, was aware of Plaintiff's prior concerns. Defendant's decision to bypass Plaintiff for promotion, while advancing less-qualified individuals without formal procedures, constitutes ongoing retaliation in violation of Title VII and the D.C. Human Rights Act.

182.    As a result of Defendant's retaliatory actions, Plaintiff suffered lost wages, emotional distress, reputational harm, and further setbacks to her professional advancement.

## COUNT FOUR

**Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the D.C. Human Rights Act of 1977, as amended, D.C. Code § 2-1401.01 et seq.**

183.    Plaintiff hereby repeats and realleges paragraphs 1 through 182 as if fully set forth herein.

184.    Plaintiff was subjected to a racially hostile work environment by Defendant's agents, including but not limited to the Team Lead, IPM Gruwell, and other managerial personnel.

185.    The hostile conduct included, but was not limited to: denial of equal access to tools and training; imposition of excessive and punitive workloads not assigned to similarly situated white employees who worked on the same team as Plaintiff; exclusion from team collaboration and professional development; refusal by management to intervene or correct discriminatory treatment; fabrication of justifications to cover up unequal treatment and to discredit Plaintiff's performance; and withholding work assignments after Plaintiff was removed from the Amazon Team, with instructions not to give her work.

186.    The conduct was severe and pervasive enough to alter the conditions of Plaintiff's employment and create an abusive working environment based on her race.

187.    Defendant knew or should have known of the hostile working environment and failed to take appropriate corrective action.

188.    Defendant's conduct constitutes a hostile work environment in violation of Title VII and the D.C. Human Rights Act.

189.    As a direct and proximate result of the hostile work environment, Plaintiff has suffered and continues to suffer mental anguish, loss of professional reputation, diminished career advancement, and other compensable injuries.

**COUNT FIVE**

**Constructive Demotion in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the D.C. Human Rights Act of 1977, as amended, D.C. Code § 2-1401.01 et seq.**

190.    Plaintiff hereby repeats and realleges paragraphs 1 through 189 as if fully set forth herein.

191.    After Plaintiff was removed from her IP Specialist assignment on the Amazon Team, Defendant demoted her to an Assistant position, despite Plaintiff's qualifications, prior experience, and continued availability to perform IP Specialist duties.

192.    Plaintiff was not reassigned to another IP Specialist team, nor given meaningful work opportunities within the IP group. Instead, she was instructed to seek work from individuals who had been directed by IPM Gruwell not to assign her any tasks. Plaintiff was ultimately forced to accept a lower-level assistant position to maintain employment.

193.    This change in role resulted in a substantial reduction in responsibility, professional status, and career advancement opportunities, as well as a capped salary below that of the IP Specialist role.

194.    Defendant's actions created working conditions so intolerable and degrading that a reasonable person in Plaintiff's position would have felt compelled to accept the demotion.

195.    Plaintiff's constructive demotion was the direct result of discriminatory and retaliatory conduct, and was carried out without legitimate justification.

196.    Defendant's conduct constitutes unlawful constructive demotion in violation of Title VII and the D.C. Human Rights Act.

197.    As a direct and proximate result, Plaintiff has suffered loss of earnings, professional reputation, career mobility, and other compensable injuries.

## COUNT SIX

**Disparate Impact in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the D.C. Human Rights Act of 1977, as amended, D.C. Code § 2-1401.01 et seq.**

198.    Plaintiff hereby repeats and realleges paragraphs 1 through 197 as if fully set forth herein.

199.    Plaintiff was the only Black employee assigned to the Amazon Team. When Monica Williams, a white IP Specialist returned to the firm and joined the Amazon Team, she was not subjected to the same adverse treatment as Plaintiff. Despite having similar responsibilities and working for the same client, only Plaintiff experienced significant barriers to success in the role, including denial of training, access to key tools, and lack of managerial support.

200.    The IPS Williams who replaced Plaintiff received immediate, in-person training, despite Team Lead's prior claim that she was too short-staffed to train Plaintiff. This justification was emphasized by the fact that another IP Specialist, IPS Roades, was out on maternity leave at the end of August 2018.

201.    Nevertheless, Team Lead traveled to Houston to provide training to the newly hired IPS Williams. This highlighted the disparate treatment Plaintiff experienced, despite holding the same position and working for the same client.

202.    Defendant maintained employment practices and policies that, while facially neutral, had a disproportionately adverse effect on Black employees. Plaintiff, the only Black employee on the Amazon Team, was uniquely subjected to the adverse application of these practices. These included the absence of standardized or structured training; denial of access to essential docketing systems and client-specific tools; unchecked managerial discretion in assigning workload, training, and support; and opaque reassignment or demotion procedures that lacked objective, race-neutral criteria.

203.    As applied, these policies placed Plaintiff at a systemic disadvantage by subjecting her to increased scrutiny, denial of resources, limited opportunity for advancement, and a heightened

risk of adverse employment actions, despite her qualifications and comparable responsibilities to white colleagues.

204.    Defendant failed to implement less discriminatory alternatives that were readily available, including uniform training protocols, transparent access policies, and objective performance evaluation criteria.

205.    These facially neutral but functionally discriminatory employment policies and practices resulted in an unlawful disparate impact on the basis of race, in violation of Title VII of the Civil Rights Act and the D.C. Human Rights Act.

206.    As a direct and proximate result of these policies and their application, Plaintiff suffered economic loss, reputational harm, diminished professional advancement, and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and grant the following relief:

a) A declaratory judgment that Defendant's actions violated Title VII and the D.C. Human Rights Act;

b) Compensatory damages for emotional distress, humiliation, embarrassment, and pain and suffering;

c) Back pay, front pay, and lost benefits, including the value of promotional opportunities wrongfully denied;

d) Punitive damages to the extent permitted by law;

e) Prejudgment and post-judgment interest at the maximum rate permitted by law;

f) An award of reasonable attorney's fees, costs, and expenses;

g) Injunctive relief requiring Defendant to adopt policies and practices that ensure equal employment opportunity and prevent future discrimination and retaliation;

h) Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues as set forth herein.

Respectfully submitted,

BY:    Dolores R. Lamar, Plaintiff, Pro Se
1095 Aspen Road
Stafford, VA 22554
Email: msdlamar@yahoo.com
Phone: 313-303-3339

Date: July 1, 2025



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

131 M Street, N. E., Suite 4NW02F
Washington, D. C.  20507
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
Washington Direct Dial:  (202) 921-2970
FAX:  (202) 827-2349
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

**To:**   Delores Walden
13918 Mattapony Drive
Woodbridge, VA 22193

**Re:**   Delores Walden v. HOGAN LOVELLES US, LLP

EEOC Charge Number:  10C-2020-00094

EEOC Representative and email:   Yumi Cosbert, yumi.cosbert@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the determination that substantial weight has been accorded to the findings of the state or local fair employment practices agency that investigated your charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue.  If you choose to file a lawsuit against the respondent(s) on this charge under federal law, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.**  Receipt generally occurs on the date that you (or your representative) received this document.  You should keep a record of the date you received this notice.  Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days.  (The time limit for filing a lawsuit based on a claim under state law may be different.)

Please retain this notice for your records.

On Behalf of the Commission:

Digitally Signed By:Mindy E. Weinstein
04/03/2025
Mindy E. Weinstein

Director

cc:   William Flanagan
Senior Counsel
Hogan Lovells, US LLP
555 13th Street, N.W.
Washington, DC 20004